IN

# THE SUPREME COURT

OF

# PENNSYLVANIA.

---

EASTERN DISTRICT—PHILADELPHIA 1867.

---

## The Warren and Franklin Railway Company *versus* The Clarion Land and Improvement Company.[1]

1. The Acts of 17th of April 1861, its supplement of 1862, of April 14th 1863, of March 31st 1864, relating to Warren and Tideoute Railroad Company, &c., authorized the Warren and Franklin Railway Company to make a railroad from Irvine to Oil City on the west bank of the Allegheny river.

2. A company was authorized to hold land and " mine for coal oil and other minerals, cultivate and improve," &c., and also " to construct a railroad or railroads from any other lands to connect with any road or to any navigable stream," &c. If they had no land they could build no road, and could only build from their own land to carry off its products.

3. They could not build a railroad independent of their own lands for the mere accommodation of the public and for the company's pecuniary profit arising only from general travel.

4. A proviso to the law was that " the said roads do not exceed twenty miles in length." *Held*, that all the roads together could not exceed twenty miles in length.

5. The terminus a quo must be on the company's land, and if the beginning be illegal there is no lawful railroad.

6. When the railroad reached a navigable stream or other railroad it ended.

7. A bill was filed by a railroad company and a motion for an injunction to restrain another company from building a road; the motion was denied, and an answer was put in under a rule. *Held*, that the defendants had actual notice that their title was disputed, and that they went on with the road at their peril before the final hearing.

8. A motion for injunction may be made at any time before final decree, and on the motion the answer is regarded only as an affidavit of the defendant.

---

[1] This and the two following cases (McCallum v. Germantown Water Company and Wistar's Appeal) were decided in 1866.

[Warren and Franklin Railway Co. *v.* Clarion Land Co.]

This was a bill in equity, in the Supreme Court, by The Warren and Franklin Railway Company against The Clarion Land and Improvement Company.

The bill was filed in the Western District, and set out that the plaintiffs were created a corporation by Act of April 17th 1861, under the name of the Warren and Tideoute Railroad Company (which, by Act of March 31st 1864, was changed to the Warren and Franklin Railroad Company), and were authorized to build a railroad from a point at or near the village of Tideoute, in Warren county, to intersect the Philadelphia and Erie Railroad at a point in that county, with privilege to extend to Franklin in Venango county, or any intermediate point; that they had located and commenced constructing a railroad from Irvine near Warren to Franklin, and are prosecuting it to completion; that their line occupies the west bank of the Allegheny river, from the mouth of Pithole creek to Oil City, in Venango county; that at many points on the west bank of the Allegheny river there is room but for one railroad, and at many of these points the defendants have commenced work with large gangs of men, with the purpose of excluding the complainants from constructing their railway, and that collisions will ensue at these points between the men of the respective companies.

The bill prayed that pending the bill an injunction may issue, special till hearing and thereafter perpetual, to restrain the defendants from interfering with the complainants, and from further working on the line of the complainants' road.

The motion for injunction was heard at Pittsburg, November 4th 1865, when affidavits on behalf of complainants were filed. The affidavits showed the facts set out in the bill, that the line was run for complainants in October 1863; that from January to May 1864 the right of way to the extent of eighteen miles had been secured, except over some wild land of small value; that the gangs of men of the respective companies were working close together and would come into collision; that the engineer of the defendants had declared that he would concentrate one thousand men at a narrow point, and drive the complainants' men from the road, and that resistance would be useless.

The motion for special injunction was refused. A rule was taken, November 20th, to plead, answer or demur, and December 19th the answer was filed.

The answer alleges the incorporation of the defendants on the 10th of August 1864 by the name of The Clarion Land and Improvement Company, and their authority to construct a "railroad or railroads from any of their lands *or real estate* in the counties of Clarion, Elk, Forest, Jefferson, Venango, Mercer and Lawrence, to connect with any road or roads in said counties, or to any navigable stream, provided said road or roads shall not

[Warren and Franklin Railway Co. *v.* Clarion Land Co.]

exceed twenty miles in length;" that in June or July 1864 they laid out on the ground a railroad commencing at their own lands in Venango county, running down Pithole creek to Allegheny river, thence on the west side of the river to Oil City, to connect there with the Atlantic and Great Western Railroad, the Jamestown Railroad and the Allegheny Valley Railroad, all in Venango county, and not exceeding fifteen miles in length; that they were then owners of land in Venango county at the terminus *a quo* of their road; that since July 1865 they have been engaged with from five hundred to seven hundred men in constructing the road, have expended for grading, and in the purchase of iron and rolling-stock, about $420,000, and the road will be completed within forty days; that their location was before the complainants, and denying that the complainants had commenced their road as set out in their bill, and that they had abandoned the intention of building such road; they aver authority to build the road by their charter and prior location; that there is sufficient room on west bank of the river for another road; they deny putting large gangs of men to work for the purpose of obstructing the complainants, &c.

Further affidavits were filed on both sides in support of the averments in the pleadings. The important particulars appear in the opinion of the court.

A motion for special injunction was made February 12th 1866, which was argued at Philadelphia on the 12th and 24th of March, by

*S. G. Thompson, W. H. Lowrie, Th. Cuyler* and *C. Gibbons*, for the complainants; and

*Geo. W. Biddle* and *H. Wharton,* for defendants.

The opinion of the court was delivered, May 24th 1866, by

Read, J.—The bill in this case was filed in the Western District, and a motion for an injunction was heard at Pittsburg, on the 4th of November 1865, and refused, on technical grounds, but with a distinct intimation from the court that there was no decision of the merits so as to preclude another application to them. On the 20th of November a rule was entered on the defendants to plead, answer or demur, in pursuance of which the answer in this cause was filed on the 19th day of December last.

This case being certified to the Eastern District, a motion for a special injunction was made on the 12th of February last, and on Saturday, 24th February, when it came up for hearing, the defendants objecting that the notice served was one day too short under the order of the court, the hearing was adjourned to Monday, 12th March. Upon a suggestion from the Chief Justice, that although the court, under their present rules, had no power

to issue a cautionary order, yet it was submitted to the parties whether all operations on both sides should not be stopped, and things remain *in statu quo* until the hearing.

This was agreed to by both parties, and the president of the defendants immediately telegraphed to stop all further work on the road, which shortly afterwards the court were informed could not be done. The reasons assigned for this non-compliance by the president are to be found in his affidavit of — March, in the third paragraph.

The argument of the motion was commenced on the 12th of March, but was not concluded until the 24th of March, owing to the Chief Justice being called away by the loss of a near relative.

The plaintiffs are incorporated by an act to incorporate the Warren and Tideoute Railroad Company, passed the 17th April 1861, with its supplements. The first supplement was passed in 1862, and these two acts are to be found in the Pamphlet Laws of 1864, pages 1064, 1065 and 1066, and which were certified by the clerk of the House of Representatives to the secretary of state, in pursuance of the joint resolution to supply certain records and papers, approved 16th March 1864 (Pamph. L., pp. 1047–8). The second supplement was passed the 14th April 1863 (Pamph. L. of 1864, pp. 1078–9). The third supplement, under which the name was changed to the Warren and Franklin Railway Company, was passed the 31st March 1864 (Pamph. L., pp. 145–6).

It is not disputed that these acts gave the right to the plaintiffs to locate their railway from Irvine to Oil City, on the west bank of the Allegheny river, and to occupy with it the very same route from Pithole creek to Oil City, which is now claimed and forcibly occupied by the defendants to the exclusion of the plaintiffs. The corporation of the plaintiffs was duly organized on the 5th of August 1863. An engineer and assistant engineer were appointed, who, in the months of September and October, in that year, ran a line of location from Irvine to Oil City, and it was staked out and marked on the ground, and a report of the examination and survey was made to the company by their chief engineer, which survey and location were adopted by the said company as their final location and line of railroad, and thereafter, in the months of January, February, March, April and May 1864, the said company, through their assistant engineer and agent, secured the right of way at different points over the cleared or improved land, and where he did not secure the right, were wild lands, which were but of small value, and that with the exception of these wild lands, the right of way was obtained for nearly the whole route.

Although it was the intention of the company to construct the

[Warren and Franklin Railway Co. *v.* Clarion Land Co.]

said railroad, but partly, as the president says, in consequence of the unsettled state of the country, and partly in consequence of the high price of labor and materials, the work was delayed until the month of September 1865, when arrangements were made for commencing it; and in the following months the work was commenced and vigorously prosecuted at a very heavy expenditure, and there can be no doubt, from the interests connected with the company, that there were ample means to complete the whole line of this railway from one terminus to the other within the period specified by the president, unless hindered and delayed by the acts of the defendants.

It will be observed that the location of the route by the plaintiffs was made months before the act incorporating the defendants was passed, and of course before they had any legal existence. Such is the case of the plaintiffs.

The Act to incorporate the Clarion Land and Improvement Company was passed August 10th 1864, and is found in the Pamphlet Laws of 1865, p. 953, in the Appendix 1864, No. 909. It is modelled after the Act of April 21st 1854, to enable joint tenants, tenants in common and adjoining owners of mineral lands in this Commonwealth to manage and develop the same (Pamph. L. p. 437), but omitting some of its most salutary provisions, such as the certificate containing a description of the lands, where located, and the number of acres, with other particulars, recorded in the office for recording of deeds in the county in which the business is carried on, in a suitable book to be provided for the purpose, and the limitation of the existence of the corporation to twenty years.

The first section creates the corporation without any limitation as to time, and it is, therefore, a perpetual charter. The second section authorizes the company to hold real estate in seven contiguous counties (reaching from the east line of Elk county to the Ohio state line, a distance of 140 miles), not exceeding 5000 acres, and they may mine for coal, oil and other minerals, cultivate and improve the same, and erect any buildings thereon, and from time to time may sell, grant, demise, alien or dispose of the same, or any part thereof, *in fee simple*, or for any less estate; and the said company shall have the same rights respecting the said land, and the division of the same into shares as are granted to the joint owners of mineral lands by the 3d section of the Act of the 21st of April 1854. The capital of the company is limited to $200,000, to be increased to $500,000 by the board of directors if approved by a vote of the majority of the stockholders. The third section relates to the election of directors and president, the appointment of officers and agents, the making of by-laws, &c.

The bonus to the Commonwealth is to be one-half of one per

cent. upon the capital stock, to be paid in four equal payments by the 2d proviso to the section ; and by the 3d and last proviso to the 4th section, it is provided, " That the stockholders of the said company shall be individually liable to workmen, laborers and mechanics employed in its mining operations, and for supplies furnished for the same ; and shall also pay such taxes as are now or may hereafter be imposed by law on similar corporations."

The 3d section of the Act of 21st April 1854, which is incorporated into the above 2d section, is in these words : " The land to be held by the company shall form a common stock, and shall be divided into shares of the value of $50 each, and apportioned by the said company among the owners and subscribers to said stock, according to their respective interests, for which certificates of stock shall be issued and be assignable and transferable in such a way and subject to such conditions as the said company may from time to time prescribe ; and the said shares of stock so created shall be, for all legal purposes whatsoever, deemed and treated as personal estate."

The last proviso to the 4th section is framed from the 5th and 6th sections of the Act of 1854, Brightly's Purd. 774, as to the individual liability of the stockholders, modified by other provisions of the charter, and the taxes to be paid.

The lands to be held by this company must be freehold lands in fee simple, for the 2d section authorizes them to sell them in fee simple (which could not be done unless they had a title in fee simple), or for any less estate, which supposes that they have the fee simple and entire control of them.    This was the construction placed upon the Act of 1854 ; for by the 3d section of the Act of 30th March 1860, Brightly 745, par. 13, " the provisions of the act (1854) to which this is a supplement, and the various supplements thereto, shall apply to lands held under lease, as well as to lands held in fee simple."

This company was a land and improvement company, and after its organization its first and proper business was to purchase land in fee simple, and to mine for coal, oil and other minerals, a right necessarily incident to such an estate without restriction or limits ; to cultivate and improve the same, and erect buildings thereon. The capital proposed is supposed to be adequate for these purposes, but may be increased to $500,000.

Having done this in good faith, then comes the 4th section in these words : " The said company shall have the right to construct a railroad or railroads from any of their said lands, to connect with any road or roads in the said counties, now built or hereafter to be constructed, or to any navigable stream, subject to the provisions of an act regulating railroad companies, approved 19th February, A. D. 1849, provided the said roads do not exceed

4 P. F. SMITH—3

twenty miles in length, and shall have power to issue such bonds, not exceeding the capital stock, as may be necessary to carry this act of incorporation into effect."

The object of this section was to give them the means of carrying the coal, oil and other minerals mined from their lands, and their produce to a point from which they could reach a market. It was not to build a railroad independent of their own lands, for the mere accommodation of the public, and for the company's pecuniary profit arising only from general travel. If they had no lands they could build no railroad, and they could only build it from their own land to carry off its products, &c.

All the railroads together cannot exceed twenty miles in length, for a different construction, with a proper arrangement of tracts of land in the seven counties, might make a continuous railroad of 140 miles, which was clearly never the intention of the legislature.

The terminus *a quo* is fixed by the locality of the land, for if it is not on the lands it can legally begin nowhere else, and if the beginning is illegal there is no lawful railroad, but simply a common nuisance. Then the terminus *ad quem* must necessarily be fixed, and that is done in two ways: 1. By reaching a navigable stream, which this railroad did at the mouth of Pithole creek, by coming to a landing on the Allegheny. If this satisfied the law then there the railroad ended. 2. To connect with any road or roads in the said counties, now built or hereafter to be constructed. The word road here might be said not to mean railroad, but perhaps the common use of the word in that sense in our Acts of Assembly should induce us to construe the word as meaning railroad, and if so, on reaching the Allegheny, the first road they met was that of the plaintiff in the course of construction.

In the fifth paragraph of the answer of the defendants it is said that the company was duly organized in December 1864, and in the latter part of June, or 1st of July 1865, said defendants surveyed and located, marked and laid out on the ground, a railroad (not exceeding in width twenty feet), commencing at defendants' own lands in Venango county, at and near Pithole City, and running thence along Pithole creek to the mouth thereof; thence down the Allegheny river, along the west bank thereof to Oil City, so as to connect at the latter point with the Atlantic and Great Western Railroad, the Jamestown Railroad, and the Allegheny Valley Railroad (which last-named road is now in the course of extension and construction to Oil City), and *also with the Allegheny river at said point*. That is, to connect with three railroads, one in the course of construction, and a navigable stream taking all and every of the alternatives in the 4th section at the same time.

The seventh paragraph avers that the corporation defendant

was at the time of the location of its said railroad, and still is, the owner of lands in Venango county (not exceeding five thousand acres), at and near Pithole City, and the *terminus a quo* of its said road.

This averment would be verbally true if they owned one foot of land at the period mentioned in the whole county, provided it was at the place mentioned. It appears, however, by the evidence on the part of the plaintiffs, that up to the 8th of March 1866, there were no conveyances of land to the defendants, except two assignments of a lease and a part working interest, executed and dated the 26th of October last, on record, and a mortgage by the defendants upon the Oil City and Pithole Branch Railroad, to secure bonds for $300,000, with 8 per cent. interest, dated 26th of September last, and recorded October 4th 1865.

To explain these matters two affidavits are produced by the defendants—one of Mr. McAboy, the president, the other of Mr. McCreary, the engineer—identifying the properties and the route of the road by a map, No. 26 in the atlas of the oil regions of Pennsylvania, published in 1866 and by blue marks and letters on a separate " map showing the subdivision into leases of the Holmden, Hyner, Morey, McKenney, Dawson, Rooker, Blackmer, Ball, Walter-Holmden, Reynolds, Luther-Wood, and Copeland farms, on Pithole creek, Cornplanter and Allegheny townships, Venango county, surveyed and compiled by Murdoch & Hanning, civil engineers, surveyors, &c., Pithole City, Pennsylvania."

Mr. McAboy's affidavit of the 9th March 1866, gives the lands owned by the defendants in Venango county as follows: (observing that no dates of the conveyances to the company being given, it cannot be said that any are distinctly averred to have been made before the commencement of the railroad). 1st. " A tract of thirty acres in Cornplanter township ;" (this has nothing to do with the terminus of the road, which is in Allegheny township). 2d. " Another tract in Allegheny township, on Pithole creek, lying at the starting point or terminus *a quo* of our railroad company." We have neither date nor quantity of land or estate given ; but by reference to the last-named map we find it marked, and is on the bank of Pithole creek, and measuring on the map about 8¾ chains in length on the creek, and 2½ chains in average breadth. There is no other land of the company anywhere near it, and it is on the McKinney farm, and is on the plot of the working interests of the Petroleum Company, and is a strip taken from the ends of No. 3 to 10 inclusive. 3. " About seven-tenths of an acre on the Ball farm, extending along the bank of the said creek." This is marked B on the map, and is nowhere near the lot No. 2. 4. " Another being three-sixteenths of an acre, in the same county on the same farm." This is marked C, and the same observation applies to it as Nos. 3, 4 and 5. Three acres on McAboy Cherry

Run Company's farm, near Plumer; also, one hundred acres in Allegheny township, on Pithole waters, have nothing to do with it. 6. "Also, an interest in three acres, Rooker farm, yielding 600 barrels of oil per diem." This is another farm and far below. 7. Then comes "the following working interests in leases on lands in the same county, to wit: An undivided one-sixteenth paid on leases, Nos. 18 and 19, on the Rooker farm on Pithole. This is marked H on the map and far below. "Also, an undivided one-sixteenth working interest in lease No. 25, on Thomas Holmden's farm, on the same creek," and is marked on the map E, and is not on the same side of the creek with the railroad. "Also, an undivided one-sixteenth working interest in lease No. 3, on the Ball farm, on the said creek," which would appear to be B and C, mentioned before. D on the map represents assignment of lease for lot No. 2, Hyner farm, and G assignment one-thirty-second working interest of lot No. 78. Both these being dated 26th October 1865, and are on page 10 of plaintiff's paper-book.

I have traced as far as the defendants would afford the information, their alleged title to lands in Venango county, forming *the terminus a quo* of their railroad, and I can find but only one piece of ground called above (2) with which the railroad has the slightest connection. It contains less than three-quarters of an acre, and is their depot, and if owned before the latter end of June 1865 by the company, must have been purchased expressly for that purpose.

Mr. McCreary was appointed engineer-in-chief of the defendants on the 29th of June 1865, and commenced the surveys of the Oil City and Pithole Branch Railway of the defendants on the 1st of July, and completed the same on the 22d of July, and the portion of the line in controversy was run between the 11th and 22d of the same month. The termini were selected in the first instance, and have never been changed—and the first grading done was on the river portion of the line—and the construction of the railroad, the answer says, was commenced in the latter part of July. Mr. Hobart, the engineer of the plaintiffs, was appointed on the 6th of September 1865, and upon passing over the line to adjust it for the construction of the railroad, he found throughout the whole extent or length of the line, from Irvine to Oil City, the benches, stakes and marks of the road as previously located, and the grading was actually commenced on said line on the 19th of October, and was vigorously prosecuted, and a large amount of work done, and the work for the construction of the entire line contracted for.

The plaintiffs and defendants both prosecuted their respective works with energy—the answer stating that they, the defendants, employed a large force of hands, from five to seven hundred in number, in the construction of their road.

The narrowness of the passage between the bluffs and the river prevented the construction of more than one road; and Mr. Barrett, an assistant engineer of the plaintiffs, in his affidavit of the 3d of November, shows that the gangs of men of the two companies were working towards each other, so that collisions must ensue, and he swears "that the engineer of said Clarion Land and Improvement Company, declared to deponent that he intended to drive by force the men of the Warren and Franklin Company off this line, occupied by them. He would concentrate one thousand men at this point, and that resistance on the part of the Warren and Franklin Company would be useless; that he intended to dispossess them by force of that portion of the road."

Mr. McCreary, in his affidavit of the 9th March, in the fifth paragraph, in relation to this conversation, says: "I stated to him that we had possession of our line, and should hold it by just so much force as was necessary to hold it. If two hundred men were not enough he should get one thousand—not drive them from their line, as represented by him."

Both these versions mean the same thing, for both were working on the same line and, of course, to go on one must drive the other off by force, which was what Mr. McCreary intended to do by an overwhelming force, so as to overpower all opposition.

The defendants, at a most extravagant and unnecessary expense, constructed their road in a most hasty manner, during the latter part of the time working seven days in the week, including Sundays, considering it a work of necessity or charity, perhaps both.

The original bill was filed in October, and a motion for an injunction made, and this bill has never been withdrawn; and there was, therefore, actual notice that their title was disputed, and that they must go on at their peril. If, therefore, their title was bad or defective, or that of the plaintiffs better, they cannot complain of the result.

In the acts relative to the Warren and Franklin Railway Company, in the paper-book of the defendants, the first three acts of the 17th of April 1861, —— 1862, and 14th of April 1863, fix or extend the time of the *commencement* and completion of the road; but the 4th and last Act of 31st March 1864, extends only the time of completion in these words: "And that the time for *completing* said railroad from its point of connection with the Philadelphia and Erie Railroad to its terminus at or near Franklin, shall be extended three years from the date hereof; but said company shall have the right to use and operate such portions of their said road as from time to time shall be ready for use."

This language strongly implies that the commencement had been made by the survey and examination, and location made and adopted by the company.

1st. Then it appears that the plaintiffs had rightfully located

[Warren and Franklin Railway Co. *v.* Clarion Land Co.]

this line before the defendants had any corporate existence, and never abandoned it.

2d. That the road of the defendants reached a navigable stream and a road to be constructed when it got to Oleopolis, at the mouth of Pithole creek.

3d. That the attempt to build a railroad fifteen miles long, under the provisions of the 4th section, by the ownership of less than three-quarters of an acre for a depot, as a *terminus a quo*, is an attempted perversion of the law and a fraud upon it, and cannot be countenanced by a court of justice. It is a pretence, a mere fiction; for if this can be done, then a hundred square feet would be sufficient for a small town-lot. It will be recollected that the conveyance for the lot is not on record, nor is its date given, nor the quantity of land contained in it, whilst the contents of two small lots, distant from it, are given with particularity as seven-tenths and three-sixteenths of an acre.

There can, therefore, be no doubt that the plaintiffs had a right to occupy this route and construct their railroad, whilst the defendants on their present showing had no right to build a railroad at all.

If this be so, then the plaintiffs are entitled to the injunction asked for. As to the road being finished forms no objection, for from the filing of the bill they had ample notice of their peril. The case of Clark *v.* Martin, 13 Wright 289, 291, was a stronger case. In that case a motion for a special injunction was made at Nisi Prius, and heard by me, in the early fall of 1861, and I refused it. It was to restrain carrying up a single-storied back-building two stories higher. The building went on, and was completed, and on appeal, the court in banc granted a perpetual injunction, the effect of which was to compel the tearing down of the additional stories, which was finally done. From this decision I dissented, but I am now convinced the court was right, and I was in error.

An almost identical case occurred in England, and was decided by Lord Romilly, the Master of the Rolls, on the 12th of January last. It was the case of Western *v.* McDermott, 35 L. J. Ch. 190. The decision was on all fours with Clark *v.* Martin. In Durell *v.* Pritchard, Id. 222, the Lords Justices, differing with the Master of the Rolls, held that the damage being completed before bill filed does not prevent relief by mandatory injunction: (see also Yates *v.* Jack, 14 L. J. R., before Lord Chancellor Cranworth, 24th March last, p. 154).

Some objections were made on the argument as to the treatment of the answer, but as a motion for an injunction may be made at any time before final decree, according to the modern liberal practice as stated by Judge Story and Chancellor Vroom (Poor *v.* Carlton, 3 Sumner 70; Sinnickson *v.* Johnson, 2 Green

[Warren and Franklin Railway Co. v. Clarion Land Co.]

Ch. R. 374), on a motion to grant or dissolve an injunction an answer is only regarded as an affidavit of the defendant.   By the 15 & 16 Vict. c. 86, s. 59, " upon an application by motion or petition to the court in any suit depending therein for an injunction or a receiver or to dissolve an injunction, or discharge an order appointing a receiver, the answer of the defendant shall, for the purpose of evidence on such motion or petition, be regarded merely as an affidavit of the defendant, and affidavits may be received and read in opposition thereto."

The rules of equity practice adopted last year have been modelled upon the present improved practice of the English chancery, and the eighty-eighth rule provides, "In all cases where these rules, or those rules prescribed by the other courts, do not apply, the practice of the court shall be regulated by the present practice of the High Court of Chancery of England, so far as the same may reasonably be applied consistently with the local circumstances and local convenience of the districts where the court is held, not as positive rules, but as furnishing such analogies to regulate the practice."

Irreparable damage is ably discussed by the late Chief Justice, in Pittsburg and Connellsville Railroad Company v. Commonwealth, 12 Harris 159, and the propriety of considering an answer as an affidavit is vindicated by the separate affidavit of the president partially explanatory of the answer, which was signed and sworn to by him.

> DECREE. — And now, May 24th 1866, it is ordered, decreed and adjudged that a special injunction be issued restraining the said defendants, their agents, engineers, superintendents, workmen, servants and laborers and employees from interfering with the plaintiff in the construction of their said railroad or railway, and also from permitting their alleged railroad in any way from interfering with or preventing the further working on the line of railroad of the said plaintiff, which is the only line recognised by the court.
>
> Security to be entered by the plaintiff in $10,000, to be approved by the prothonotary of the Eastern District.

WOODWARD, C. J.—Although it is quite probable that I would think this a case for injunction if it were here on final hearing on bill and answer, yet, as it is presented, I do not consider it a proper case for special injunction, and therefore dissent from this decree or order.